All right, we are happy to begin our argument in our final case today. We'd be pleased to hear from you, Mr. McNamara. Thank you very much, Your Honor. My name is Robert McNamara. I'm here representing Colin Health Centers and Washington Imaging Associates. The District Court's core error in this case, Your Honor, is the failure to properly apply the Rule 12b6 standard. Instead of taking all of the complaint's factual allegations as true and drawing all reasonable inferences in favor of the plaintiffs, the District Court wholesale adopted the government's vision of the complaint, and in fact, failed to cite most of the relevant factual allegations in the complaint. Now, the complaint in this case supported relief under four separate theories, and each legal theory is an independent basis for reversal and remand. There are theories under the Dormant Aspect of the Commerce Clause, and there are theories under the 14th Amendment to the United States Constitution. And if I could, I'll start with the Dormant Commerce Clause claim. I think the most analogous case— I can't make it under the Dormant Commerce Clause. The 14th Amendment jurisprudence would be subsumed, wouldn't it? It does seem pretty unlikely that on a fact record that doesn't carry our case on pike balancing that we'd prevail under the rational basis test, but the complaint does support all four theories, and we're entitled to build a fact record on all four theories. Is that your best shot? Absolutely, Your Honor. Pike balancing is a higher standard of review than rational basis scrutiny, and certainly on our practical effective discrimination argument, that triggers strict scrutiny. And if a law survives strict scrutiny, I think everyone can agree that it would probably also survive rational basis scrutiny. And so since the Commerce Clause is the higher standard of review, I think it makes sense to start with those cases with those arguments. And I think probably the most analogous case here is this Court's 1993 decision in the Metagen case. Metagen, like this case, was a challenge to a certificate of need requirement. West Virginia in that case, the state of Virginia here. And in Metagen, like this case, the plaintiffs argued that the administrative burdens of the certificate of need application process were so high as to be unconstitutional. And what the court said in Metagen was that this was clearly a burden on interstate commerce, that it limited market entry and that burdened interstate commerce, and that those burdens were not justified by any local benefits generated that it could find in the record. Really, the big difference between this case and Metagen is that in Metagen, the court had the benefit of a fact record. Metagen was, as I recall, decided on a trial on stipulated facts. And so the court could look at the fact record and say either there are local benefits supported by the record or the record shows there are no local benefits. It said the latter. Here, the only thing the court has is our complaint, which is 40 pages long but is no substitute for an actual fact record. And that's what we're entitled to build on these claims. That's- Trial on stipulated facts? Yes, Your Honor. So you're saying it's like a bench trial? Yes. I actually don't think there were any factual disputes at all. I think the court just took stipulated facts and made findings from those, but effectively a bench trial. How many stipulated facts arrived at? I'm not sure, Your Honor. I would imagine after discovery, through the exchange of interrogatories and requests for admission- Here, you just had the complaint, did you not? Yes, Your Honor. We were unable to conduct any discovery. There's nothing to balance here. Is that your point? Exactly, Your Honor. The complaint clearly alleges that there are no local benefits generated by Virginia's Certificate of Need law. And certainly, we will have to fight about that on remand, and it may be that discovery- Generally, it's the task of the legislature to balance burdens and benefits. That's what legislatures do all the time. How do we keep the pike balancing test from making us into a super legislator? And so, legislature and so forth. Because you can take pike balancing pretty far because there are an awful lot of regulations and legislation that have conceivable effects upon interstate commerce. And so, what's the limiting principle that prevents pike balancing from transforming courts into super legislatures? Just give me some help with that. How do we cabin this? Well, Your Honor, I think the limiting principle is facts. It's the requirement that plaintiffs introduce a fact record and carry a burden. Pike balancing is deferential to the legislature, but it's deferential on a fact record. And I think a great example of this- We agree it's, at the end of the day, it's a deferential test. Pike is absolutely a deferential test. This Court has repeatedly said so. It is perhaps less deferential than the rational basis test. But however high a burden plaintiffs will have to carry on remand, they're entitled to introduce evidence attempting to carry that burden. Let me ask you this. If we remanded, what exactly would you- give me a little forecast of how it's going to play out on remand. What kind of evidence would you, primarily, would you seek to introduce if we were to remand, both in making clear, delineating the burdens, and also in trying to attack the notion that there were benefits? Tell me what you would like to put on. Absolutely, Your Honors. There are two sides to the question, the burdens on interstate commerce and the local benefits that are generated by the law under Pike. On the first, we would want to conduct discovery into how heavy those burdens actually are. And this is all information that's in the possession of the State of Virginia. But, for example, how frequently do entities that begin this process give up the process because of the large expenses? Or, for example, how long does the process take in practice? That's something this Court looked at in the Yamaha Motors case, where the statute said the process would only take a certain number of months. But the facts actually showed that, in reality, the process took far longer. We'd want to see how many people are not even beginning the certificate of need process. And there is an amicus from a company called Curve Beam testifying that it's certainly not just the plaintiffs in this case who have difficulty or have decided not to undertake the enormous expense of the certificate of need process. So we try to track roughly the kind of evidence this Court had before it in Medigen and Yamaha Motors Court, both of which the Court actually found the law failed Pike balancing, that this law effectively prevents people from purchasing this kind of low-dollar equipment. We're challenging that it makes, at minimum, purchases of this low-dollar equipment much more expensive and that frequently people faced with the daunting burden of the certificate of need process— create a disincentive for doing that, but doesn't prevent them from purchasing the equipment. Well, as a practical matter, Your Honor, it frequently does. The equipment we're talking about can be purchased on the open market for as little as $100,000, $150,000. And we're talking about a process, especially if a certificate of need applicant draws an objection from an existing Virginia business. The process can stretch out over years and actually cost even more than it costs just to purchase the simple equipment we're talking about. Do you have any notion about how long the process stretches out at this point? There are terms in the statute of how far the process is supposed to last. I think if you count up all the deadlines in the statute, it's supposed to be eight months. In the absence of an objection, I think the evidence will probably show that it is frequently eight months. But when an objection is drawn, if an existing certificate of need holder comes forward—and this is all in the complaint— fact-finding is required, and a process that amounts to full-blown litigation ensues that takes literally years with attorneys and expert witnesses well beyond the scope what the statute calls for on its face. That's something we'd have to show factually. The effect of these objections is to massively draw out the administrative burden of the certificate of need process. So does it make a difference as to how long the process stretches out for in-state applicants, for certificates, as opposed to out-of-state applicants? It would, Your Honor, with respect to our argument about the practical effect of discrimination on interstate commerce. With respect to pike balancing, it actually doesn't. And this Court made that clear in Yamaha Motors. In Yamaha Motors, the Court actually said— It doesn't make a difference there, does it? Because it simply—you're looking at the burden on interstate commerce as a whole. Absolutely, Your Honor. And in Yamaha Motors, the Court conceded that most of the people applying for the dealership permit— Just in terms of the pike balancing, wouldn't one of the benefits be that in order to purchase this sort of equipment, it's hideously expensive? And is it really fair to believe that somebody is going to purchase the equipment and then find themselves— and make the capital investment necessary to start a practice, and then find themselves simply not able to make a go of a business because they are, let's say, two radiologists, two gastroenterologists operating in close proximity to one another? And also, in a sense, can the certificate process be looked at something that facilitates interstate commerce by creating an incentive to purchase equipment with some assurance that it will be utilized for its expected life? I mean, it's not—I can see scenarios where the certification process, to some extent, would actually facilitate purchases. That's certainly something the government would be entitled to argue on remand, Your Honor. But it's a determination that would have to be made in light of facts. In Medigen, the Court pointed out several possible justifications for the law—the prevention of ruinous competition or overinvestment in infrastructure. But then it said that on the fact record before it, there was no evidence that those benefits were actually achieved in this particular market. And here, we'll be able to present plenty of evidence that that's the case with respect to these kinds of purchases as well. Are you going to be able to quantify all these things, burdens and benefits? Some of them seem to me to be difficult to quantify. And one thing we don't require legislatures to do is to present empirical proof of their legislation in order for it to pass a constitutional test. That's certainly true, Your Honor. The one thing that makes this case a little easier than other Pike balancing cases is that it's in the context of a Rule 12b6 motion, where all we have are the allegations of the complaint taken as true. And so here, what we're balancing are burdens, which the complaint says are very heavy, against benefits that the complaint says don't exist. On a fact record, the balancing inquiry might become harder, and it's certainly possible that discovery doesn't go our way and we're not able to build the fact record that I expect as I stand here today. But all we have today is the complaint, and the complaint says we're balancing very heavy burdens against benefits that literally do not exist. And if Pike means anything, it means that in that situation, the law has to fail. Is there anything we're to read into the fact that Congress repealed the National Health Planning and Resource Development Act? Is there anything to be garnered from that? Absolutely, Your Honor. Your Honor, certificate of need laws originate in essentially a federal experiment driven by largely the sorts of concerns Judge Wilkinson referred to. This might be a way to reduce health care costs. It didn't work. Congress changed its mind in 1986 and repealed the requirement that states have certificate of need laws. And the signing statement by President Reagan, he said it had been a tremendous failure. Absolutely. And those conclusions were actually reaffirmed by a joint FTC-DOJ study in 2004 that we cite in the complaint at paragraphs 96 to 99, showing that while the federal government has concluded that these programs don't actually reduce health care costs, they don't improve health outcomes, they don't have the local benefits that are promised, that what they turn into is essentially a way for powerful local interests to protect their own economic advantage from outside intrusion. That's why the federal government has ultimately come down heavily against them in general, not just against the especially draconian program Virginia has. You say it protects local interests, but if a local practice group in radiology or gastroenterology wants to make a big investment in equipment or add to its existing facility, the in-state group would have to secure a certificate just as much as the out-of-state group. Two responses to that, Your Honor. First, that was exactly the situation in Yamaha Motor Corp. In Yamaha, this court acknowledged that what it called those brave enough to try to open new dealerships would almost certainly be Virginians. But it still found that the prohibition on opening new dealerships failed the pike balancing test. But as a second response, I don't think that's actually an accurate way to describe how Virginia's certificate of need program works. Because the one thing the in-state established doctors don't have to deal with is the objection of the existing in-state established doctors. If an out-of-state doctor or practice group wants to come in and purchase something. So what you're suggesting is the in-state establishment gathers around to facilitate in-state applications, but sort of phalanxes against out-of-state applicants? Well, if you're an in-state certificate of need holder, Your Honor, you have two advantages. First, if you need to upgrade your equipment, you can do that without going through the process again. You can purchase this and replace an existing piece of equipment without bearing these burdens. But second of all, if you're an existing certificate of need holder, there's one big thing you don't have to worry about if you're going into the certificate of need process. And that's that you yourself will come in and object and turn it from this eight month process into this four to five year long process. That's the in-state out-of-state problem. All right. Is that a bad answer? Yes, Your Honor. I'd just like to reserve the remainder of my time for rebuttal. I want to mention one other thing. On that Madigan case? Yes, Your Honor. Actually, I looked. There were two opinions by Judge Copenhaver. And I know our opinion refers to stipulated facts. But actually, if you look at both his opinions, he had a three day bench trial. And they're both in the bench. But there was a little more to stipulated facts. OK. Yes, Your Honor. I don't know how that got here. But you were starting out. It was all stipulated facts. It's worth much more than that, I think. Yes, I certainly apologize. And I don't mean to suggest that the parties can't dispute facts in these cases. Thank you, Your Honor. Mr. Gatchell would be happy to hear from you. May it please the court, Duncan Gatchell for defendants. The reason we filed a 12 v. 6 motion was because the other side was so candid in what they wanted to do. They wanted to subject the legislative facts underlying the statute to a courtroom fact finding review. And the case law of this circuit and of the Supreme Court makes it clear under the rational basis test, and even under a pike, that legislative facts are not subject to judicial in court factual review. What legislative facts are you specifically referring to? Well, what they say is that the certificate of need program does not serve the economic function that the General Assembly thinks it does. And they say that it doesn't have putative local benefits, which is the flip side of the same coin. And so because it was clear that if they survived the motion to dismiss, nobody would have any idea of what to do now because you can't have a trial on these kinds of challenges. We went for a 12 v. 6 dismissal. Mr. Gatchell, could you cite to me any other form of economic activity in this country that lacks congressional approval like this does, that's premised on the notion that competition is economically disadvantageous? Actually, Congress under the Commerce Clause could shut these programs down if they wanted to. Absolutely, Congress could, but they repeat. But Congress, by making that judgment, despite the fact that there are some agencies and some people and President Reagan's signing statement may not agree with the General Assembly, it is not the function of a court. But that's not my question. I'm just trying to put this thing in some framework. It seems like, of course, there's this enormous health care industry out there, and it seems to me that they have adequately pled that they're running into a wall bringing some of these things into the Commonwealth of Virginia based upon its certificate of need. So my question is, just moving away just for a moment from the certificate of need program, is there any program anywhere that you can cite me to that lacks congressional authority, that simply has something akin to this certificate of need program? I cannot point to specific programs. I will say that the entire regulatory state is subject to the same criticism, that there are a lot of people who don't believe that economic regulation by the government actually functions the way it's supposed to. But ever since the repeal of, or rather the overturning of Lochner, it has not been... I'm not getting into Lochner, and I'm not suggesting that this necessarily leads anywhere. But I'm just trying to determine, is there anything else out there in the national economy, anything at all that mirrors this kind of thing? I am confident there is because I have so little confidence in the fact that we are regulating efficiently everywhere. But I'm not an expert in this field, so I don't have one to point to. Well, but the troubling thing about it is it is here on a 12B6, and suppose we happen to find out, suppose it's the case that this process is just extraordinarily long, that it's manipulated by in-state interests to the detriment of out-of-state interests. When you read the statute, there are provisions for this period and that period, and then you can have a hearing. And you look at all these different time periods in the statute, and you say, well, this could really be stretched out over a period of years, and it could be utilized in a way to pose such a burden upon market entry as to discourage out-of-state medical providers from purchasing equipment. Well, why should I purchase the equipment? Because I'll never be able to fight my way through the certificate of need process that Virginia has. And the question I have is when you have something where the potential for delay and abuse does seem to me to be apparent, at least to exist, the potential. I'm not sure whether it does or doesn't, but the potential exists. Shouldn't we look into it a little bit further and take some evidence and find out what's actually happened? I have two answers to that. One is that if you're really going to plead that, then you have to investigate and plead plausible facts and not just mere conclusion that that's happening. And we happen to know, because it's a matter of public record subject to judicial notice, that in 2011, 45 of 53 applications were approved. And we also know that- So then you'd win after a little bit of discovery. But that leads me to my second point. I don't know how I should be subjected to discovery if the real theory is that the litigant wants to have judicial review in a in-courtroom factual session of the legislative judgment, the legislative fact supporting the enactment that says this is a good way to economically regulate the medical industry. The response to that is that you're correct, it seems to me, in the sense that the pipe balancing ought to be a deferential test. And in the same way that rational basis equal protection is a very deferential test. But on the other hand, it doesn't mean that it doesn't exist. And if we take your point of view, wouldn't we be reading the- wouldn't we be reading pipe balancing sort of out of existence? Because what happened here was the district judge just took your brief. The district judge didn't- I'm just not sure a whole lot of analysis was applied here, because the opinion was virtually a verbatim recitation of your brief. Now, that's not illegitimate, but it's also fair, it seems to me, to raise the question of whether some inquiry might be beneficial. Can I move backwards up the complaint and get to Pike Church? Because it seems to me that, one, on privileges and immunities, they acknowledge that that couldn't be reached below and can't be reached here. That would have to go to the Supreme Court. Then they have a count entitled substantive due process, and I think it's so well established that there is no substantive due process claim for an economic regulation. That's kind of a straw man. I mean, we recognize that. What about the dormant commerce clause claim? I would say the same thing with equal protection. And you mentioned that judicial notice thing. They might not agree that that stuff you're talking about is subject to judicial notice. I mean, you put those numbers in your brief. That's where the judge got them. Copied them out of your brief. Here's my problem with Pike Church. I mean, there might be something about those numbers, and they may go and go behind the numbers and look at some of those things. Judge Copenhaver, in that other case, the case of these sites, had a three-day hearing out there in West Virginia. I want very much to address that. But a preliminary point of that is I would like to claim the same entitlement to dismissal under equal protection on a rational basis as well, because you can pause it and the legislature has paused it. I think this panel, as I understand the drift of my colleague's question, recognizes a clear difference between the commerce clause inquiry and the 14th Amendment inquiry, because the commerce clause inquiry is directed at an economic subject matter, where you go into equal protection and start differentiating and saying whether we would or we wouldn't differentiate between colonoscopies and cardiac imaging and everything. It makes us into a state health department, and nobody wants to do that. But the commerce clause thing is the normal commerce clause seems to have something, seems focused and directed upon something like this. And all I have to say about that is this, that the same theory that was advanced on the other accounts is advanced here, which is the legislature was wrong when it thought the putative benefits were there. Then why do we have pike balancing at all? I mean, what utility does pike balancing have? Because I have a question as to whether you want to read it completely out of existence. Well, here's what the Supreme Court said in United Haulers. With respect to similar arguments, a desire to look at the underlying policy of the putative benefits, there's a common thread to these arguments. They are invitations to rigorously scrutinize economic legislation passed on the auspices of the police power. There was a time when this court presumed to make such binding judgments for society under the guise of interpreting the due process clause. Courts should not seek to reclaim that ground for judicial supremacy under the banner of the dormant commerce clause. And I would also call the court's attention to Kentucky versus Davis, where the court said in a bond tax case, if we had to balance the effect on the interstate commerce against the local policies of selling these bonds, that wouldn't be a judicial function. So I don't think that Pike Church, which only came along in 1970, is in the most robust good health in the Supreme Court. Let's put it this way. What function, then, does Pike have? I mean, because rational basis scrutiny is a highly deferential scrutiny, and yet I think if a piece of legislation is utterly arbitrary, it would fail even that. Now, we do have this Supreme Court case out there, and we do have Pike balancing out there. And given your formulation, what role remains for it? My concern is that you've completely eliminated Pike balancing altogether with what you've just told us. What role does it, because we can't ignore the Supreme Court case, so what role does it retain under your framework? Well, let me answer narrowly and then broadly. The narrow answer is that in this case, where the legislatively determined harm is making the very sales that they want to make here, and the legislature has determined that those sales are contrary to the public good, that under the Pike Church formulation you can determine on the pleadings that the balance is not commensurate. If you accept, as you must, the legislative facts that public harm exists and it's being averted, then you know that you can't have a balance that's going to tip against the state's position. But what role does it retain? I mean, I want to know. I've got this case out there that I have to deal with, and I want to know, in your plain and simple words, when do you Pike balance and when do you not? And when do you balance? You Pike balance in two circumstances. One is where the state is actually not just having an indirect effect of its police power on interstate commerce, which is usually the case with police power enactments, but is actually directly regulating the channels and instrumentalities of commerce, as in the mudflap case. But you don't have to balance in that case because that's a strict scrutiny there, and if it discriminates that, isn't that? No, I think the reason the courts went to Pike with respect to the size of the trucks and the mudflaps is it didn't discriminate on its face against anybody. I think it was just a direct regulation of commerce that was thought to be too much commercial regulation when states only have police power and they can get away with the police power if it only indirectly affects commerce. I think the other category of Pike case is where the discrimination is not present with sufficient clarity on the face of the statute, but the court finds that there's been a pretense, a pretext. For example, the Rowland case in Puerto Rico, the grandfathering was corrupt. It was obviously intended not to really have a regulatory scheme, but to protect the local interest. Yamaha was the same thing. Madigan was the same thing. Suppose it takes years and years and years for a medical provider to make the capital and to actually obtain one of these certificates of needs. Are we prohibited from looking at that? I think that under the plausibility standard of Plombly, they didn't plead this in a way that should cause this court to crank up that machinery because I don't think they allege discrimination except in conclusory terms. If this apparatus, if this program... We're not talking about discrimination here. We're just talking about a process that takes years and years and years, just leave discrimination out of it. Just the process itself takes years and years and years to complete, particularly for out-of-state medical providers. Is that just something that we should simply shrug our shoulders? One on the... I'm sorry, I didn't mean to... About because wouldn't a delay and a bureaucratic system that complicated, difficult to navigate, have a very substantial effect on interstate commerce? Well, one, if the harm to be averted is wasteful sales, I don't see how the fact that the process lasts a long time implicates commerce clause concerns. And remember, the whole regulatory state as it exists in most of the country, both state and federal, one of the criticisms of it is it takes forever. And so if that were a commerce clause objection, then we're really making Pike Church something new and different and exciting. But also... Well, if it does take forever, if all these things you say it's very common for these state regulatory processes to take forever, isn't the cumulative effect of that to balkanize the country? And doesn't the... to balkanize the country into separate economic units and doesn't the commerce clause have something to say about that very phenomenon? First, there's been no non-conclusory pleading that this one does last forever, as I read the statute. Well, we don't know. We need to find out. Well, actually, on the face of the statute, they're well set for a time. We don't have anything except a complaint. They're time limits. All we have is a complaint. Well, no, we have a statute, and there are time limits on the statute. And also, remember, you can only object. I mean, they're not depositing that the process absent an objection takes forever because there are clear statutory limits on how long it can take. They're talking about objections. But it also seems to be somewhat of a common sense application in saying that these things are problematic. I mean, you know, CT, you look at the regulations and proposals to expand an existing medical care facility CT services through the addition of a CT scanner to be approved when the existing services performed an average of 7,400 procedures and so on and so forth forever. And I just have this view or feeling that something is being just walled off here. I mean, there's kind of a common sense to it that somebody would be bringing their CT scanners into Virginia or their other equipment into Virginia and be performing these services if Virginia didn't have this need program. I mean, it just seems like there's some common sense to that. But the legislative determination is they shouldn't. That's the harm to be averted. Competition is the harm to be averted. It negates the commerce clause. Yes. No, it doesn't negate the commerce clause because competition, as long as it doesn't discriminate by origin or citizenship, most of our regulation restricts competition. And the legislative theory here, right or wrong, in some platonic sense is that by restricting participation where that participation would be wasteful and drive up the total cost for the community is something that is to be averted under the police power. What keeps them from doing the same thing about a case of Coca-Cola coming over from West Virginia? It has a little more sophistication when we talk about medical care, but it's the same thing. This statute comes with a presumption of constitutionality and regularity. It's like 35 other state regimes. It is based on a plausible legislative understanding. Suppose it happens that Virginia is the most stringent of those 35 states. As long as it's not alleged to be plausibly alleged to be benefiting the locals at the expense of the non-locals. And here the same rules apply whether you're a New York corporation running a facility in Virginia or a Hawaiian corporation or a Virginia corporation. There is no facial discrimination. There is discrimination in the sense that you call them But the point is, once they are essentially domesticated, that they have an operation in Virginia, they've got a leg up on people from other places. They have a leg up on people from the same place. Everybody similarly situated is treated the same. There is absolutely no protectionism on the face of this statute and no reason to imply one. Nobody has alleged it's facially imbalanced. Economic protectionism is not unconstitutional. We've lived with tariffs a long time in this country. The philosophy behind a tariff is that you need a certain protection from competition in order for domestic industries or in-state industries to get going. So regardless of their views about competition and protectionism, neither one is per se unconstitutional. The point is, on the pike, might it not cross a line at being so onerous that the burdens on interstate commerce are substantial and the putative benefits speculative? Isn't it possible that just looking into it a little more would help us resolve some of these questions under what you rightly say is a deferential standard? You're right about that. The one thing I would ask is if it goes back to be looked at more, that it be made clear that the underlying economic theory of the General Assembly is not on the table for courtroom fact-finding. No, I don't think anybody thinks that it is. It's a deferential test. The question is, at some point, and we don't know at what point because this was resolved bare bones, at some point it's going to build up real walls against out-of-state medical providers of people purchasing medical equipment that could conceivably be of great benefit to some of the people of Virginia. I'm not trying to make myself, it's a thin line, and I'm not trying to make myself into a legislator, but I do know that there's a constitutional value here. And all I would say is we threw in Dormant Commerce Clause with the others because they were so open that they wanted to litigate in a courtroom setting the underlying legislative facts, and we don't think that's appropriate. And we also don't think they adequately pled under Twombly any possible Commerce Clause problems that should be sufficient to crank up the machinery. Thank you. Thank you, Your Honor. Mr. McNamara. Thank you, Your Honor. Only two quick points in rebuttal. I first wanted to address Judge Wilkinson's point that deferential judicial review doesn't mean no judicial review, and I think that's exactly true, both under the Pike Standard and even under the Rational Basis Standard. It's just not the case that plaintiffs are never allowed to adduce evidence and never allowed to bring these claims. And, in fact, sometimes plaintiffs even win. That's true under the Commerce Clause when it comes to Medigen and Yamaha from this circuit. It's even true under the Rational Basis Test, most recently in the St. Joseph Batty case out of the Fifth Circuit earlier this year. There is no categorical rule that says facts aren't allowed under these claims. It's just the standard of review is deferential. And second, to address Judge Wilson's question about whether the ultimate corporate parentage of these businesses matters, if a Hawaii corporation has been domesticated and has a Virginia Certificate of Need, that absolutely doesn't matter for Commerce Clause purposes, and I would point the court to American Trucking Associations, where the advantaged group in American Trucking Associations was trucks with Pennsylvania plates. The Supreme Court didn't inquire into whether it was an Ohio corporation that owned the truck with Pennsylvania plates. Pennsylvania plates were advantaged, and that was a violation of the Dormant Commerce Clause. Do you have any more questions? We thank you, Mr. McNary. I appreciate both of you being here today. Thank you, Your Honor. We will adjourn court and come down and say hi to you. The Somerville Court stands adjourned until tomorrow morning at 8.30. God save the United States and the Somerville Court.
judges: J. Harvie Wilkinson III, Robert B. King, Samuel G. Wilson